Good morning. Just barely. It may have pleased the court. My name is Kerry Hansel. It's my privilege to stand here today and represent the children and family of Veronica Williams. As this court has already held, the state-created danger doctrine applies here and qualified immunity does not. The trial judge seized on the question of whether or not there were confirmative facts sufficient. Why do you say the court's already determined that? Well, Your Honor, because the facts have only improved since the version that was before the court in the prior opinion. In terms of the allegation of the complaint, there are none that didn't prove up and there are many additional facts. Not sort of the issue here, isn't it? I think it is. Absolutely. Yes, Your Honor. But given the facts as they proved up, the facts are far stronger than they were the last time we were before this court. So, for instance, we have in this case evidence that we did not have before, that Lioi, during the period of time when Williams came to surrender... Well, that's part of the point. I mean, you didn't have any evidence before. I mean, we were just going on the motion to dismiss, correct? We had to assume everything that was said there was true. Everything that was said in the complaint, that's correct, Your Honor. And as the case proved up, everything in the complaint proved true and then some, which is my point. And for instance, one fact that we did not have the last time we were before this court but that makes this case much stronger than it otherwise might have been is that when Williams came to turn himself in, Lioi had him in what Lioi describes as a secured area with a locking mechanism behind a caged door with a lock on it where an officer had to grant access. In other words... Yeah, but when you allege in a complaint that officer's conduct led to and caused the death or the murder, that's just an allegation which we have to accept when it comes to summary judgment. And all the legal elements, in other words, have to be resolved. The allegations assert some facts and we accept those as true and we give you the benefit of the connection of the facts. But here on a summary judgment, you have to satisfy now that there was the causation and all the other things that are in play. Well, that's absolutely true, Your Honor. With respect to the state-created danger doctrine, it is a lower standard than causation might be. What we have to show is that the affirmative acts enhanced the danger. With respect to causation, which is another question, what we have demonstrated in this case is that it is all but admitted. So what's all admitted? All but admitted, the causation element. And here's why. Both of the defendants have admitted that had they made the arrest, that the murder would not have taken place. How do they admit that? There's evidence in there that says that, and the court relied on it, that he would have been released. And your experience and my experience is that's almost 100% true. I can't conceive a situation where he would be detained more than 24 hours. Leobi had his whereabouts two hours before the incident, Your Honor. I understand. And Leobi says, Leobi admitted, if he'd been arrested at that time, we're not talking about days before, two hours before the incident. All that does is preclude the murder on a particular hour. Which was the murder that we're here to talk about. I understand, but that doesn't preclude the murder. It precludes the timing of the murder. The timing could have been the next day, the following day. Well, Your Honor, the fact of the matter is to suggest that the fact that the officers didn't detain somebody, and the guy then, because they didn't detain him for 24 hours, he would have, the murder wouldn't have occurred, is a far reach. I mean, it just does not... That's a little bit like the criminal defendant who shoots somebody saying, well, he might have gotten shot the next day. So what difference does it make? It's just the opposite. Here, he did murder. I mean, you can't, that's, you got the flip side of it. You got it backwards. But we don't, Your Honor. Because here, what's critical is, she was in hiding. He alleges, Cleveland Williams alleges, he knew generally where. But the only opportunity he had to know exactly where she was going to be in public and undefended was during this court proceeding. So he had a very narrow window of time in which to commit this murder. And Leobi himself admits, admits, if he'd been arrested at that time, when Leobi knew where it was two hours prior, because... Yeah, but you seem to be confusing an abstract but-for causation theory with the state-created doctrine. Well... The state-created danger doctrine, and that's two very, very different things. I agree with you, Your Honor. Judge Niemeyer asked me about causation. I was addressing causation. Causation is easily addressed because both defendants admit, if they had made the arrest at different points, there would have been, the murder would have been prevented. That's causation. With respect to state... Right, but in that circumstance, then, all of our cases from Pender forward would have been reversed, and so would the Supreme Court's decisions. No, Your Honor. This doesn't fly in the face of any of those decisions. With respect to the question of... Yeah, but you would make the same but-for causation determination in the abstract with regard to the Citadel in the Rosa case, and in Pender with regard to the defendant in that case. That, in a metaphysical sense, had the actions been undertaken at the time, that would have prevented the later act. My apologies, Your Honor. I'm trying to address two separate issues, as you correctly point out. Judge Niemeyer asked me about causation, which is completely different from the state-created danger doctrine. So, I was not saying that there is a state-created danger because but-for this action, there would have been, she would have survived. I was merely saying the causation element that applies in every case is satisfied because but-for the actions of these officers, she would have survived. You cannot say that. You cannot say that, except the officers both admitted it, Your Honor. What better evidence could I have? They would have to admit it only if they knew the murder was going to occur, and they could have prevented it. But that goes to a bigger question in this case, is where is the shot to conscience evidence? In other words, where is the conduct distinct from the slaughter case, which we decided, where the woman was exposed to a fire, and she didn't have the proper training, and there was a lot of negligence about the city, and she died in the fire? Because this isn't negligence, Your Honor. No, that wasn't negligence. They said it was even worse. But my point is they did not intend to murder or have the murder caused. And they didn't even suspect a murder was going to be caused. And the slaughter case requires you to prove that these officers conduct themselves in a manner that shocks the conscience. The conscience-shocking standard is more appropriate when there are split-second decisions being made. This isn't that case, and we've suggested that in the paper. Why doesn't it apply? I thought you brought a 1983 case here. We did, Your Honor, and it doesn't apply because this is not a situation where there are split-second decisions being made. Instead, here, there is a much lower standard. The correct standard is deliberate indifference. Where is the split-second found in any of the state-created danger cases? Oh, very frequently, Your Honor. Very frequently, the officer is on the scene and has to make a decision about what happens on the scene. Well, name the case. I'm sorry, Your Honor? Name a case where that was applied. I don't think, I can't. I'll stop my head here. And slaughter didn't depend on that either, too. It was totally planned. Except, Your Honor, that the cases we have cited to the court apply a lower standard. But let me step back from that. You're not addressing the question. In other words, the question is, you're trying to hold these officers responsible for some totally unforeseeable conduct that resulted from their being held responsible for a murder conducted by some third person. But I'm not, Your Honor. And let me tell you what does satisfy shots at the standard. I've respectfully suggested it's not the standard, but I don't think this is... Why not? Because this did not involve split-second decision-making, because we have cited... We never held that. I'm sorry, Your Honor? We never held that in slaughter. With respect to that distinction, Young v. City of Mount Rainier, which is a Fourth Circuit case from 2001, said, under certain circumstances, conduct falling within the middle range of culpability, that is more than negligent but less than intentional, can give rise to liability. And it goes on to say the exact degree is a case-specific test in terms of what the standard is. Most circuits have interpreted that case-specific test to mean shots the conscience applies only in split-second decision-making. The Supreme Court relied on that, for instance, in City of Sacramento v. Lewis. But I want to get to the facts, because I don't think it matters, and here's why. I think what happens here meets shots the conscience. And so, regardless of the standard, this is not a standard case. It's not a case where if it's this standard, one result would pertain. If it's another standard, another result would pertain. It would be helpful for you to explain that, because I have real trouble distinguishing this from the literally hundreds of cases that will happen today, will happen tomorrow, and happened yesterday, all across Virginia, all across this country, where people are allowed to self-surrender on a misdemeanor warrant. I mean, that just happens all the time. It seems like the thrust of your position is that in every one of those cases that there is self-surrender, some event happens that causes injury because of that, and that can't be the law. It isn't, and it's not our position. This is far more... How is that different from your case? I'm trying to explain it, Your Honor, if I may. This is far different from that for this reason. In this case, Leo admits when the warrant was found, he kept it in his possession for five days instead of putting it in the computer system so it could be served. That's not a mere failure to arrest. It's not a mere schedule to surrender. He diverts the warrant into his personal possession and keeps it so it can't be served, so this man is allowed to be free. Leo writes him a letter, a sort of a get-out-of-jail-free card, two letters actually, to show to any other officer if he is stopped, that basically say, I'm paraphrasing because of time, but it has another assault warrant, that that warrant shouldn't be assumed to be him, even though Leo said he only knew one Cleveland Williams, only had ever met one, and didn't do any research to determine whether it was him. It turned out to be him. And another letter to get him out of this incident. So it isn't the case that they merely scheduled... Neither letter was ever used, and neither one was factually incorrect. It's not the question of whether it was factually incorrect.  Leo took the warrant and diverted, as this court previously said, quote, actively interfering with the execution of the warrant by failing to turn the warrant over to the proper unit within the BCPD. Well, that was in the context of your allegations that there was this grand conspiracy to do that. And those allegations proved true, because Leo and Williams both testified that they together agreed to make sure that the warrant was not going to be served. Leo kept it in his personal possession. He wrote this letter. Russell, for his part, ordered that it not be served, told Leo that he had this deal with Williams. It's pretty clear that Russell also is the person who was responsible for the warrant. But the facts would seem to contradict that, because Mr. Williams showed up at the police station to self-surrender, and they couldn't find the warrant. He showed up and told Leo that he had a deal with Williams, which... I'm sorry, with Russell. And Leo called Russell, and Russell confirmed that deal. And then Russell told Leo... Yeah, but if they would have had the warrant, they would have served him right then. Except there was no requirement to have the warrant, Your Honor, and they both admitted that. It wasn't the case that you need a warrant. Police officers don't have to drive around with a semi-truck full of warrants to arrest people. If they know there's an open warrant, they make the arrest. They had a jail cell right there at the facility. He was released as part of an agreement, and they admitted this. Leo and Russell admit that they made an agreement with this man, who was their friend, that he would not be arrested. Leo diverted the warrant, did not give it to the warrant service people so that nobody else would arrest him. Leo wrote these letters. It's clear that Russell is the likely suspect that put the warrant above the visor so it wouldn't be found for a couple of reasons. Well, that's pure speculation. I mean, there's no evidence to support that. Well, Your Honor, the evidence is it was in the hands of someone in Russell's presence. That person says they gave it to someone, can't remember who, and then Russell is the person who calls Leo and says, look above the visor. So it's pretty strong circumstantial evidence that Russell had something to do with putting it above the visor because the whole department is tearing the place apart, if Leo is to be believed, looking for this warrant, and then Russell ignores Leo's calls, calls a few hours later and tells him exactly where it can be found out above the visor in a patrol car. So that's pretty strong evidence that he had something to do with the diversion of the warrant, but we don't need to go that far because Leo himself says that he took the warrant when it was found on that visor on the 13th or 14th and kept it in his personal possession instead of registering it with the unit charged with serving him, which is what the procedure requires, until the time of the murder. And they have both admitted that they agreed for the later turn in. How do you handle Castle Rock, the town of Castle Rock? I'm sorry, Your Honor. How do you handle that case? Why isn't that dispositive? With respect to, I'm sorry, with respect to the conduct of the officers, basically the failure to arrest. Right, so in Castle Rock, Your Honor, the police were contacted to enforce a restraining order. All they did was not make the arrest. That is not our case here. Here, there was an agreement to make sure this man remained free and affirmative steps taken to make sure it happened, including diverting the warrant. You said they had, in other words, that's nothing more than some details of why the government refused to arrest him. In other words, do they agree not to arrest him? They're basically saying that they refused to arrest him. And Castle Rock basically says the public is not entitled to police accountability with respect to a third person affected by that. But these officers are not merely, not merely failing to arrest. They're taking the affirmative actions of making sure there will be no arrest and that nobody else can make an arrest by violating procedure and diverting the warrant, writing these letters. We think the evidence shows, and it is, it is an inference, but we're entitled at this stage, even at summary judgment under Rule 56 to inferences, there is an inference that it was Russell who put the warrant above the vice. So for, and we also have text messages that the officers are sending, in effect, instructing this man about how to remain free. Don't go home. You'll force us to serve the warrant. You'll force our hand and giving him advice about how to keep his freedom. So this is an active conspiracy by all three. And they told him in those texts to stay away from your wife. Don't be around her unless you have witnesses. That's exactly right. And Leo, he said he was worried about further assaults. So these are men who themselves say they were worried about this assault of behavior, who had before them a determination by a commissioner that there was enough to it to charge, who had before them a domestic violence order. It's completely different from Rosso. They don't have any duty to arrest. It's not about the duty to arrest. Sure it is. You're imposing on the, you, the police could have said, we're not going to arrest him. They don't have any duty. And if they agree not to do it, they still are within that scope. And they'd be fine. The Constitution? Well, sure. They are. But what they can't do is divert the warrant, provide him with- Sure they can, because all of that is their refusal to arrest. The public, they have no duty to the public, to third persons, to make arrests. But they have a duty not to throw the cloak of their protection around murderers and allow them to murder. And that's what happened here. That's what happened. Well, that's a pretty strong statement. You know, this man was not a murderer. He was subject to a misdemeanor order. And he was a- And he appeared many times. They didn't have any inkling that murder was going to happen. He had a second- So he's not, they're not cloaking a murderer. He had a second degree assault conviction. He had a- So that makes him a murderer? He had an active domestic violence order. And Leone said he was afraid of further assaults. You know, Mr. Hansel, it doesn't help your case to make statements that are really sort of off the chart and then come back and try to support it. I mean, there is no evidence in this case that ought to be clear that they had any foreshadowing that this man was going to murder his wife. Your Honor, whether or not they have foreshadowing of the murder, they knew he had been convicted of assault, there was an active domestic violence order, and- And that occurs in hundreds of cases in Baltimore City. Hundreds of cases. And these people are all subject to orders and repeat orders. And then they're released and various things, sure, things get handled and the wife gets beat again, but the officers are not charged with notice that these domestic orders are going to lead to murder, number one. And number two, the officers have no duty to arrest these people, even if they chose, they chose, apparently what you're saying, they chose not to arrest them and they agreed upon that. But that still is a failure to arrest. And that falls squarely within Tana Castle and Dashani and the other cases that address this. Your Honor, respectfully, it would if that were it. But the, and I see my time is up, I apologize if I may just finish. It would if that were all, but here we have the additional facts of affirmative steps to try to protect him from arrest by anyone, which they themselves admit had they not undertaken this woman would still be alive. And so while it is true that we don't require the police to make an arrest, even if they can, what we ought to require of them and what courts have required of them around the country with respect to this doctrine is not to increase the danger to the defendant, which is the only standard we meet in diverting the warrant so that no one citywide could In letting these get out of jail free letters, in texting him about how not to get caught, in we believe respectfully that there's an inference that Russell hid or help tied or directed that the warrant be hidden because he knew exactly where to find it. In doing those things, they instead are protecting and conspiring with this man. And whether they knew he was a murderer, I respectfully, I agree with the court in that regard, but whether they knew he was a murderer, they certainly knew he was assaultive. They certainly knew there were open domestic violence orders. There were warrants for assault and actual convictions for assault in the past. Leone says he was worried about future assaults. And under those circumstances, they do have a duty not to actually help, not to take these affirmative steps. And for that reason, we'd ask that the court reverse the opinion below. And I thank you for the extra time, Your Honor. Thank you. All right. Thank you, counsel. Ms. Walden? Good afternoon, and may it please the court. My name is Lisa Walden. I'm here today on behalf of Majors Leone and Russell. The state-created danger doctrine that appellants rely on is rarely invoked and never successfully in this circuit. It is a very limited exception to the general principle that no constitutional violation generally lies where the state fails to intervene and protect from private violence. In precedent cases arising from circumstances every bit as tragic as Cleveland Williams' murder of his wife, Veronica, this court has consistently and rightly cautioned against the expansion of this doctrine. As the court made clear in Pinder and recently reinforced in Doe, a state-created danger claim requires affirmative action by the state actor, and if those actions created or increased the risk to the plaintiff. Despite their hyperbole, appellants have been unable to develop evidence of either element, and summary judgment was properly granted. There's no evidence for affirmative action? Your Honor, I think it's important that in thinking about affirmative action for purposes of the state-created danger doctrine that we be careful not to think of that as you would in the vernacular sense. Well, no, I'm thinking of it in just plain language, English language. Acts that you take affirmatively to accomplish something. This is not a case where we're talking about an officer, albeit negligent, say, went off, had a warrant, went off to vacation for three weeks, forgot about it, and that's like, oh, lack of diligence, lost it. This case, and you have to take the facts, right, because you have to concede all the facts at this point that are true, right? There were all that are, in a sense, the ones that unless they have been conceded, they're can actively work to make sure that this warrant would not be served. This is not a question where someone negligently didn't, or as Justice Nehemiah says, no duty to serve it at all. They said, OK, let it sit here. We don't have to serve it. That's not the case either. Instead, as alleged, in terms of the facts of this case, that no, they actively said, let's put these pieces together so that it won't be served. And his counsel is writing a record that even said, well, if this is the way you do it, don't go near because then we may have to serve it. That's active participating in accomplishing a goal. That's not just failure. How is that, tell me, you can't ignore all of those, the facts in this case. So, Your Honor, I think your question implicates a few issues. I'm going to try and unpack them all at the same time. I started when you said that there was no act. There was no affirmative act within the meaning of the state-created danger doctrine here, Your Honor. Correct. All right, good. So what does the act have to be for it to be meaningful in state-created endangerment? So most recently in Dovi Rosa, this court explained that affirmative acts for purposes of this doctrine are limited in scope, and it cannot be that the state commits an affirmative act every time it does anything that makes injury at the hands of a third party more likely. But the court also, Your Honor, reinforced that you cannot stretch the concept of affirmative acts beyond the context of immediate interactions between the state actor and the plaintiff. And it is beyond dispute that there were no interactions between either Major Leoie or Major Russell and Ms. Williams in this instance. I think PINDER itself- Your Honor, we are- Is that your position? That is the state of the Fourth Circuit law at this moment. That can't be the law. That can't be the law. So what you're basically saying is that as long as they don't talk to the person, they can say, this is hypothetical, obviously. You know what? You got trying to get rid of your wife or whatever. We can do this and that. That doesn't happen. This came just hypothetically. They could do all of that as long as they don't talk to the wife or talk to the victim. Not to forget the bloodiest facts in this case. As long as they don't talk to the person who was ultimately killed or injured, all those acts don't count. Is that the law? Your Honor, I think to extend the state created danger doctrine to include a claim where that interaction does not occur, you would have to expand on the en banc decision of PINDER in this case.  What were the facts of PINDER? In PINDER, we had a situation where a woman calls the police to her house, Ms. PINDER, because her ex-boyfriend, who had been recently released from prison, having previously been convicted of trying to burn down Ms. PINDER's home, had come to her home, broken in, assaulted her, and threatened her and her three children. The officer appears at the home, takes the man into custody, and assures Ms. PINDER that this man is going to be charged that evening with serious enough charges that he will be held overnight, and in addition to that, that Ms. PINDER herself should not be bothered with going to the court commissioner to swear out charges of her own, because the court commissioner will not be available to her until the morning. On those assurances, Ms. PINDER goes to work, leaves her children at home for the evening. I just want to get to the point. What happened ultimately with the commissioner? Go ahead. Ultimately, the officer declined to make the more serious charges, charged Mr. Pittman, I believe it was, to lesser crimes that resulted in his immediate release with instruction to stay away from the PINDER home, which he, of course, declined to follow and proceeded to the PINDER home, where he burned it down, killing the three children inside the home. In that instance, you had, obviously, a direct interaction between the officer and the victim, and the officer, if anything, could be said to have been more active in causing harm here, because... No, he didn't. What the officer was doing, PINDER makes sense. I'm trying to help in a situation. I'm responding to your call. I'm telling you this. I'm going to try my best to make sure that the charges are this, and then the intervening thing, the charges is that, the law is the law. That's not this case. This case is just the opposite. We're not talking about good faith, as alleged here, not good faith officers trying to further the law. It's just the opposite. They're trying to upend the law. You've seen this totally in opposite facts. To be clear, Your Honor, I think at this point in the proceeding, the appellants are entitled to the benefit of the record and reasonable inferences therefrom, but there is no basis on this record to infer that there was any ill will on anyone's part. The only thing that this record reflects, taken as a whole, is that these two officers agreed with Mr. Williams that he could turn himself in at a later date, and that they would not now aggressively seek to enforce the arrest warrant. And I think relevant to the context of that decision here- In furthering what? What goal? In PINDER, it was furthering the goal of trying to help the victim, who unfortunately, who was injured or dying. But here, is that the case here? A reasonable inference that he was trying to help the wife? There's no indication that the officer's action had anything at all to do with the wife. The indication is that they had an arrest warrant that, I think it will be helpful if I can give context to what would have happened had Majors Leoy and Russell done nothing at all. Had Majors Leoy and Russell done nothing at all, the record evidence is that this misdemeanor warrant would have made its way to Central Records, where it would have been put on file. And at that point, nothing further would have happened to it, unless and until Cleveland Williams were to have an incidental encounter with police on the street. And the record evidence is that he was affirmatively endeavoring not to do that, because he knew that if he encountered police, he would be arrested. It is- And who told him to lay low? Aren't they alleging that he was told to stay away from a person who could identify him and call the police and say there's a warrant against him? Your Honor, I think the evidence on that point is the text messages- I believe what you're referring to is the text messages between Leoy and Mr. Williams, at which point this is, I believe, the morning of the 17th. At that time, Leoy is instructing Mr. Williams to stay away from his wife, that he would not go around her. And if he did go around her- What purpose? If he did do it, what would happen? I assume to Leoy's mind, any number of things could have happened. He would have to arrest him, right? What- Right? Why do they say he needs to stay away? For the avoidance of further conflict and problems, that there's- he questions the possibility that the wife could make additional accusations against him, which is the reason that a witness should be there if there's going to be any meeting. In net, there's no realistic possibility here that Mr. Williams was going to be more likely to have been arrested on this warrant, had the majors been involved. Not at all. Well, how many police officers are there in Baltimore? Roughly 900, I believe, Your Honor. And how many would have been- In patrol. Well, how many would have, by computer, been alerted that a warrant was formed, had it gone to Central and gone out there? All of them, right? No, Your Honor, I don't believe that's the record. That's not the- I didn't say the record, I'm saying just the fact. If it had gone to Central, wouldn't it have been put in a system where all 900 officers would have known that an outstanding warrant was on this man? The system is set up such that an officer encountering Mr. Williams on the street could have then called into Central Records and learned that the warrant existed, yes. Right. However, it's fairly evident that Mr. Williams was, of his own volition, entirely avoiding that type of an interaction in addition to- Well, how do you want us to take every inference on your favor? It's just the opposite. No, Your Honor, that's not an inference. That's Mr. Williams' testimony. He was avoiding encounters with- So we have to take his testimony for his presence, since what you're saying, we have to conclude that that's a fact. It's the only evidence. That he didn't go anywhere. That he didn't go anywhere. Sorry? You're saying he didn't go anywhere in Baltimore between that time. I don't know that the record reflects what he did. Exactly. You don't know. So you don't know whether or not what the likelihood is encounter with the other 900 officers would have been. But yet you're saying that it would. That's my whole point. You're turning it on its head that you're doing just the opposite. You're saying that everything ought to be concluded in your head. Well, who knows whether or not the other 900 would have encountered him because he was laying low. Did you say that? He testified that he was avoiding police. Yeah, but does that mean he didn't go outside? Avoiding police? I'm sure he did go outside, Your Honor, yes. Yeah, how many times? So we don't know, right? We don't know. We don't know. No, correct. So you can't cabin the endangerment by making that conclusion, can you? The endangerment, that's what we're talking about, endangerment. Your Honor, the danger created... The danger is created every time you help him not be arrested. You agree with that? You agree with that? That endangerment, I thought it, I didn't think, I thought the 14th Amendment jurisprudence was that there is no endangerment created by police officers' failure to protect. Absolutely, that's correct. In other words, the police officers don't have to arrest anyone if they see it, no affirmative duties. Arrest, no affirmative release. So none of that is endangerment. They need to protect from private violence, correct. And they had no relationship to this woman at all. They basically conspired, in the plaintiff's view, not to serve a warrant or not to arrest him. To do what is, in fact, a very ordinary act, as Judge Agee pointed out, conspired, sort of carrying with it negative implications, to do a thing that is very routine, which So you said the facts of this case, as alleged, as ordinary for Baltimore police officers, what they did here? I said the voluntary surrender on a misdemeanor warrant is... No, no, but this is more than just a voluntary surrender. That's the voluntary surrender is, sir, we have a warrant for you, would you please come down here? That's that. But I'm talking about the facts of this case. You're saying this is ordinary behavior for Baltimore police officers, was alleged here? Your Honor, the allegations, which I think were passed at this point, included a great many... But they're facts. They're facts, too. No, Your Honor, they are not. They're facts. The fact that they were told, he was told, that we're not going to, didn't get it to Central, why didn't they put it in Central? They didn't... Is that normal for Baltimore police officers, to deliberately not put it in Central? There was conflicting testimony in the record about whether that is normal, or it's not normal. Ultimately, there is absolutely... Is that the same thing as disputed? If it was material, perhaps. Don't you think it's material? On what the legal requirements here are, Your Honor, no. The legal requirements here for an affirmative action, if the conduct of the officer and Pender does not meet it, assuring the person in person that this man who has threatened her is going to be kept overnight, if that doesn't qualify as an affirmative action, if the affirmative actions in Doe, concealing the allegations of abuse that allow the person to remain free and commit further violent acts against children, if those things are not affirmative actions, the conduct of these officers, even with the benefit of all reasonable inferences from the record evidence, are not themselves affirmative actions. Moreover, the affirmative actions have to be addressed to the victim. Here, the victim wasn't even aware of any of this. They didn't... As a matter of fact, the only thing they addressed vis-a-vis her is an instruction to him to stay away from her. Correct, Judge Niemeyer. That was the holding in the en banc decision in Pender, and it was recently reaffirmed in Doe v. Rosa. I think the facts in Doe were that there were instructions to the perpetrator, in effect, to lay low, as well, with foreknowledge of the folks at Citadel as to what his past history was. It would seem like, to me, that that's a pretty close match to this case. Correct, Judge Agee. Mr. Reville, in that case, I believe it was, was told to stay off campus and, as you say, lay low. So, what does a stated creative endangerment case look like, since you said this circuit has never found one? Your Honor, for exactly that reason, it would be impossible to say exactly what it might look like. But can you just... It's hypothetical. I mean, what would it look like? I really am interested. It's not a rhetorical question at all. What does it look like, in terms of a police officer? Your Honor, I really hesitate to speculate on that matter. I'm asking you. So, you don't need to hesitate. Just answer my question. Your Honor, if, for example, an officer is sitting at lunch with his friend and the friend explains a present intention to go out and harm someone else, the officer hands that person a gun and diverts the entirety of the police department to another task, and himself goes and helps to protect this friend of his as he commits this crime, perhaps there you have a state-created danger that does not involve direct contact with the plaintiff. But, I mean, that would be a departure. Even that would be a departure. So, it takes murder in the first degree, basically, what you just said. No, Your Honor. Because that would be a first degree murder. It would be in the first degree. Respectfully, Your Honor... In fact, she just came out. That would be in the first degree. That wouldn't even be better. I mean, you'd be in the first degree. Respectfully, Your Honor, you asked me for an example, and I attempted to provide one. That's why I said in your example, does it take first degree murder? No, Your Honor, I don't know that it does under all circumstances. I think here, though, I think here, though, the existing law exists the way it does for excellent policy reasons that really counsel against, and are the reason that Pender goes out of its way to caution this court against going, enhancing the scope of this doctrine. But it doesn't have any existence, let alone enhancing scope. Really? You said... There are requirements, and they are not satisfied by the evidence in this case, but that doesn't mean that the doctrine does not exist. The doctrine is narrowing cabin for good reason. As the court in Pender pointed out... What's the good reason? As the court in Pender pointed out, Your Honor, to create an affirmative obligation, protection would open police departments to unlimited liability, never mind the practical reality that a command that every police department has to go out and aggressively, affirmatively serve every misdemeanor warrant that is outstanding in that jurisdiction would be practically impossible. As a practical matter, a department like Baltimore, where there are many, many, many outstanding misdemeanor warrants and limited police resources, is simply incapable of complying with such a command. In addition to that, Your Honor, that command places the department in the awkward position of being asked to go out and create potentially violent and dangerous situations for the RSD, for the officer, and for the surrounding community by confronting the RSD in the community under circumstances that otherwise perhaps could be negotiated on a voluntary basis. As Castle Rock says, the discretion in the police to choose the time location in terms of serving a morass warrant is pretty definitive. What was done here and what the record evidence shows here is nothing more than an agreement to the self-surrender of a known community leader on a misdemeanor warrant. You talk about positive, how many people are killed or seriously injured by domestic violence in America every year? There's no doubt that that is a tragic and very serious problem, Your Honor. Does that rise to any kind of policy at all and concern about the public interest? You talk about policy, everything went one way about, you know, is that an important part in terms of our nation and policy in terms of that domestic violence? Certainly. Most of the times, gun violence in the home, domestic violence. Certainly domestic violence is a tragic problem, Your Honor. Detection with a weapon, far more people are killed by domestic violence with guns in their home than they are stopping would-be break-in, aren't they? I suspect that that's probably true, Your Honor. Certainly domestic violence is a tragic problem in our society and there's no question that that is a serious policy concern and interest. So I ask for your position. You equate this case with solely all it is showing that they allowed him to turn himself in. That's what you say. All these facts in this case, this is nothing but a case of... And that this is an omission case, yes, Your Honor. Okay. That's all I have. I see that my time has concluded, if you're... Thank you, Counsel. We appreciate it. Yes, Your Honor. Mr. Hansel, they say your case is only a matter of allowing someone to turn themselves in. No more. And that's all you have. If it were, I should lose. But it isn't. It's so much more than that. This is a situation where, and it's interesting that Counsel cites Doe because Doe explicitly distinguished the present circumstances and said that there can be liability where Leoie was acting to thwart the arrest warrant. And here are the ways he did that. He actually... Doe didn't say that. The exact quote from Doe, Your Honor, is, unlike here or in Descheny, the officer in Leoie put the victim in a far worse position by acting to thwart the arrest warrant. Well, Doe didn't say that. You're reading from the prior decision on 12B6. No, Your Honor, that's Doe. That's Doe versus Rosa. Doe is, in Doe, they distinguish this case and distinguish the facts of this case. They also say in Doe, the key distinguishing factor between Doe and what happened here was that Leoie enabled Williams to evade an arrest warrant for domestic violence. That's on 12B6. We're not here for that. But they're citing those facts as being critical to satisfying the doctrine we're here to talk about. And you're right. That was in a 12B6 context. But those facts proved up now that we're here in a Rule 56 context. The way they proved up is through the text messages telling him how to avoid arrest and avoid service of the warrant. Counsel mentioned... Or, I'm sorry, the court asked whether there was any evidence that he was just sitting at his house. No. He was driving around. The text messages say he's driving around, he's driving past his house. He asks in the text message, should I... Your whole argument, even if it were amplified and exaggerated, focuses on the lack of protection that the police department's giving to a member of the public and the failure of the police department to act appropriately so as to protect the public. And in that context, it's just hornbook law that we don't hold police departments to those duties. And if they did them negligently, it doesn't matter because they didn't have the duty in the first place. But respectfully, Your Honor, it's not about failing to protect the public. It's about... That's the only way you can get a claim. If it's not protecting the public, then the plaintiff in this case or the victim in this case, your claim is derivative from the victim. It's instead about the fact that they protected the perpetrator. They had him in custody behind a locked door and let him out. They gave him letters to show other people to secure his freedom. They diverted the warrant so that no other officer could... You're giving me a case where they let somebody out on bond or they let somebody out without arresting him and he goes out and murders somebody that the police are responsible? It's just inconsistent. It's not even understanding the concepts of applicable. Except here, they had a duty to keep him there. He was there to surrender himself. They did not have a duty to keep him there. That's my point. But they had a duty not to give him the letter, not to... They did not. Vis-a-vis the victim, in this case, they had none of those duties. In other words, they don't have a duty to stop him, to arrest him, to prevent him being on the street. They only have a duty to keep him away from her house. They had a duty... This goes back to Deshaunay, it goes back to Rosa, it goes back to Pender. But certainly, Your Honor, they had a duty to allow the other officers to do their job and not divert the arrest warrant, which this court previously held was a violation. And in Doe, the distinction was made, that is why this case is different. That is why this case would have resulted in a violation, because they divert the warrant. Both Russell and Leoie engage in that activity. Russell, evidence shows, and I think it's a question for the jury, certainly, but evidence shows that he was involved in diverting the warrant. Leoie says he flat-out admitted to it. But don't you understand how all of this is our descriptions of an omission conduct? In other words, the fact that they fail and refuse to serve warrants and agree to let him come in and are friends with him, it's the failure to serve a warrant. But it's a failure to protect in the bigger picture, and the bigger picture is failure to protect the victim in this case. There's no duty to protect the victim. If it were mere failure, I would agree with you. These are affirmative acts, so hiding the warrant is an affirmative act. Well, the affirmative acts have to be directed at the victim. In other words, because the state-created doctrine creates a danger to the victim, which the victim can sue for, but not the omissions. And everything here is omissions, even though they conspired to omit. Respectfully, Your Honor, they don't have to be. These are directed at the victim, because it is the warrant for the victim's complaint that's diverted. It's the warrant for the protection of the victim that they divert from the ordinary course and make sure it doesn't get served. It's the victim's arrest warrant that they're giving the letter on. It's the victim's- They don't have a duty to do any of that. It fails to understand the jurisprudence of due process clause, vis-a-vis the police. Except, Your Honor, if there's any affirmative act that enhances the risk, then this doctrine applies. And here there clearly is, in this court's ruling, and I see my time is up. If you may just finish my sentence. Yes, you may. Thank you, Your Honor. In this court's ruling in Doe, the court says that this case, Leoie, is different for these reasons. And so as this court has ruled, not just in the 12B6 context, but also in Doe in distinguishing the facts that have now proven up, we have affirmative actions that resulted in this case, in this woman's death. And certainly, at very minimum, generated a jury issue understanding the low bar we have to meet, which is only that it increased or enhanced the risk. Thank you, Your Honor. Thank you. Thank you. Counsel, please be recognized. We'll ask the clerk to adjourn the court for the day, then we'll come down and greet counsel. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Roger L. Gregory, Paul V. Niemeyer, G. Steven Agee